

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*United States District Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

September 22, 2020

**BY ECF**
The Honorable Naomi Reice Buchwald
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:  *United States v. Tsani Russell*, **19 Cr. 554 (NRB)**

Dear Judge Buchwald:

    The Government respectfully submits this letter in opposition to defendant Tsani Russell's September 14, 2020 motion for temporary release from custody in light of the COVID-19 pandemic. For the reasons set forth below, the defendant's motion should be denied.

    **I.    BACKGROUND**

    Defendant Tsani Russell, a Criminal History Category VI offender, is charged by indictment with one count of conspiracy to commit Hobbs Act robbery and one count of Hobbs Act Robbery, in violation of 18 U.S.C. § 1951. In short, and as detailed in the underlying complaint (Dkt. 1), in March 2018, while on pretrial release for New York State charges, the defendant and another man robbed a Target store in the Bronx. The men, who wore masks during the robbery, used a key to enter the store's "money room," from which they took more than $200,000 cash, and then fled with the money on a blue and white motorcycle.

    A store employee reported that another employee, Tiffany Meynard[1] told her in the days prior to the robbery that Meynard had accidentally brought a key home from the store, and did not bring it back the same day. Toll records for three cellphones subscribed to Meynard reflect dozens of calls to and from a cell phone subscribed to in the name of "Psani Russell" at an apartment address in Brooklyn, New York (the "Russell Cellphone").

    The owner of the blue and white getaway motorcycle, who had reported that motorcycle's theft from the rear of a residence in Queens a few days before the Target robbery, was shown surveillance camera images depicting the two robbers as they fled on a blue and white motorcycle, and identified that motorcycle as his stolen motorcycle, based in part on its distinctive aftermarket exhaust system. Cell site location data for the Russell Cellphone reflects that at approximately 1:03 a.m. on the day of the Motorcycle theft, the Russell Cellphone connected to the Sprint network through one of two Sprint

---

[1] Meynard, who is identified in the complaint as Co-Conspirator-1, pleaded guilty to Information S(1) 19 CR 554 (NRB), which charged one count of conspiracy to commit Hobbs Act robbery.

cell towers that services the Rockaway Beach area where the motorcycle was stolen.  This was only the second time that the Russell Cellphone had connected through either of the two Sprint Cell towers in the more than five months prior to the motorcycle theft.

The day before the robbery, both the Russell Cellphone and one of Meynard's cellphones connected to Sprint's network through cell towers located approximately 750 feet from the Target Store.

The defendant was arrested in July 2019.  Magistrate Judge Fox ordered that he be detained on consent without prejudice.  Your Honor denied the defendant's subsequent bail application on August 28, 2019.

## II.     LEGAL STANDARD

Under the Bail Reform Act, a pretrial defendant shall be detained pending trial if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e)(1).  The Government bears the burden of proof as to risk of flight by a preponderance of the evidence, and as to danger to the community by clear and convincing evidence.  *Id.* § 3142(f); *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007).

When a defendant has been ordered detained pending trial, the "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of the United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."  18 U.S.C. § 3142(i).  Courts in this District and elsewhere have recognized, in the course of deciding bail applications based on the current pandemic, that the determination of whether there is a "compelling reason" for a defendant's release under this provision requires the court to "balance the reasons advanced for such release against the risks [of danger to the community and/or flight] that were previously identified and resulted in an order of detention. In turn, whether temporary release under § 3142(i) is proper requires the individualized analysis of the facts of each case."  *United States v. Chambers*, No. 20 Cr. 135 (JMF), 2020 WL 1530746, at *1 (S.D.N.Y. Mar. 31, 2020) (Furman, J.) (internal quotation marks omitted); *see, e.g., United States v. Estevez*, No. 18 Cr. 669 (JPO), 2020 WL 1911207, at *1 (S.D.N.Y. Apr. 20, 2020) (Oetken, J.).[2]

---

[2] For example, in a case where a defendant's medical condition warranted pretrial release from detention, the defendant faced a terminal illness, could only receive necessary life-prolonging treatment if released, and was awaiting trial.  *See United States v. Scarpa*, 815 F. Supp. 88, 89 (E.D.N.Y. 1993), supplemented (Mar. 5, 1993).  In *Scarpa*, the defendant was granted pretrial release when it was found that he was terminally ill with AIDS and his medical condition could not be managed appropriately by prison medical facilities.  The court noted that the defendant could receive "necessary and humane treatment *only* under care of his physician," and had "entered the final stages of this fatal illness."  *Id.* (emphasis added).   Even in those extreme circumstances—where the defendant's illness had actually manifested—release was conditioned on the defendant's "confine[ment] to Beekman Hospital under the 24-hour guard of the United States Marshal's Service at [defendant's] own expense."  *Id.* at 89, 92.

Even if a defendant establishes a compelling reason for release, that release must be into the "custody of the United States marshal or other appropriate person." 18 U.S.C. § 3142(i).

### III.    DISCUSSION

As the Court previously found, the defendant would pose a substantial danger to the safety of the community and a risk of flight if released. Those concerns are not outweighed by the risks associated with the COVID-19 pandemic. Accordingly, the defendant's motion should be denied.

#### A.    The Defendant Poses a Substantial Danger to the Safety of the Community and a Risk of Flight

This is hardly the defendant's first encounter with the criminal justice system. The defendant has seven prior convictions, accumulated from 2004 through 2019, multiple prior revocations of parole, and committed the instant offenses while on pretrial release. The defendant's prior convictions include:

- a 2004 conviction for grand larceny in the third degree, in violation of New York Penal Law ("NYPL") Section 155.35, for which the defendant was sentenced to 28 months' to 7 years' imprisonment. The defendant's parole was later revoked.

- a 2007 conviction for possession of burglar tools, in violation of NYPL Section 140.35, and attempted criminal possession of stolen property in the third degree, for which the defendant was sentenced to one year imprisonment and 18 months' to 3 years' imprisonment, to run concurrently. The defendant's parole was later repeatedly revoked.

- a 2011 conviction for unauthorized use of a vehicle, in violation of NYPL Section 165.05, and possession of burglar tools, in violation of NYPL Section 140.35, for which the defendant as sentenced to concurrent one year terms of imprisonment.

- a 2016 conviction for petit larceny, in violation of NYPL Section 155.25, for which the defendant was sentenced to one year of imprisonment.

- a 2018 conviction for unauthorized use of a vehicle in the third degree, in violation of NYPL Section 164.05, for which the defendant was sentenced to a conditional discharge.

- a 2019 conviction for unlawful fleeing of a police officer in a motor vehicle, in violation of NYPL Section 270.25, for which the defendant was sentenced to a conditional discharge.

At the time of the instant offense, the defendant was on pretrial release in connection with charges pending against him in Suffolk County Court for grand larceny in the third degree, possession of stolen property in the third degree, and unauthorized use of a vehicle in the second

degree. A bench warrant for his arrest was issued in April 2019, the month following the instant offense.

That history provides context demonstrating the dangerousness of the defendant's conduct in this case. Notwithstanding the defendant's prior convictions, periods of imprisonment, prior parole violations, and pretrial release status, the defendant violated federal law and committed a violent felony. The defendant has demonstrated that will ignore judicial supervision and engage in dangerous criminal activity, presenting a danger to the community.

The defendant's conduct also establishes a significant risk of flight, in that he committed the instant offense while on pretrial release, and then remained on the run from pending Suffolk County charges until his July 2019 arrest in this case.

The defendant now asks to be released to live with his girlfriend or father. There is more than a preponderance of evidence that, upon such release, he will once again abscond and commit dangerous crimes.

Accordingly, the defendant poses a clear and substantial danger to the safety of the community and a risk of flight. He must remain detained pending trial.

### B. The Defendant Should Not Be Released Under 18 U.S.C. § 3142(i)

#### a. The Defendant Has Not Established a Compelling Reason for Release

The defendant notes that his BOP medical records reflect that he suffers from asthma and uses an Albuterol inhaler. (Def.'s Mot. at 3). He also correctly notes that, "according to the CDC, people with moderate to severe asthma *may be* at higher risk of getting very sick from COVID-19." (*Id.*) (emphasis added).

The Centers for Disease Control and Prevention (CDC) has identified two categories of medical risk factors affecting the likelihood of severe outcomes from COVID-19. First, the CDC presents a list of conditions that, according to current data, definitively entail a greater risk of severe illness. The CDC no longer includes asthma in this category. CDC guidance currently includes asthma (moderate to severe) in a second list of conditions that "might" increase the risk of severe illness. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. In an update posted on June 25, 2020, the CDC advised with regard to conditions on the second list: "COVID-19 is a new disease. Currently there are limited data and information about the impact of underlying medical conditions and whether they increase the risk for severe illness from COVID-19."

It is notable that during his initial health screening in July 2019 the defendant denied any history of respiratory problems. *See* Exhibit 1, Defendant's BOP Medical Records, at 33.[3] Indeed, the medical records reflect that the defendant's first report of asthma appears to have occurred on

---

[3] The Government will submit Exhibit 1, the defendant's medical records, for filing under seal.

August 10, 2020, when he also reported having lost the ability to smell or taste, and that he was suffering from difficulty breathing. *Id.* at 2 and 57. The defendant was then tested for COVID-19, with two types of tests, both of which returned negative results. *Id.* at 1.

The defendant's arguments in favor of release due to COVID-19 rely less on his reported asthma than on the purported failure of the Metropolitan Correctional Center ("MCC") to contain COVID-19. However, the BOP generally, and the MCC specifically, have and are prepared to handle the risks presented by COVID-19.

Since at least October 2012, the BOP has had a Pandemic Influenza Plan in place. *See* BOP Health Management Resources, https://www.bop.gov/resources/health_care_mngmt.jsp. Beginning in January 2020, the BOP began to plan specifically for COVID-19 to ensure the health and safety of inmates and BOP personnel. *See* Federal Bureau of Prisons COVID-19 Action Plan, https://www.bop.gov/resources/news/20200313_covid-19.jsp.[4]

As part of its Phase One response to COVID-19, BOP began to study "where the infection was occurring and best practices to mitigate transmission." *Id.* In addition, BOP stood up "an agency task force" to study and coordinate its response to COVID-19, including using "subject-matter experts both internal and external to the agency including guidance and directives from the [World Health Organization (WHO)], the [Centers for Disease Control and Prevention (CDC)], the Office of Personnel Management (OPM), the Department of Justice (DOJ) and the Office of the Vice President. BOP's planning is structured using the Incident Command System (ICS) framework." *Id.*

On March 13, 2020, BOP, after coordination with the Department of Justice, implemented its Phase Two response "in order to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff." *Id.*

BOP's national measures are intended to "ensure the continued effective operations of the federal prison system and to ensure that staff remain healthy and available for duty." *Id.* For example, BOP (a) suspended social visits for 30 days (but increased inmates' access to telephone calls); (b) suspended legal visits for 30 days (with case-by-case accommodations); (c) suspended inmates' movement for 30 days (with case-by-case exceptions, including for medical treatment); (d) suspended official staff travel for 30 days; (e) suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to only those performing essential services, such as medical treatment; (g) suspended volunteer visits for 30 days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified operations to maximize social distancing and limit group gatherings in [its] facilities." *Id.*

---

[4] *See also Module 1: Surveillance and Infection Control*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf; *Module 2: Antiviral Medications and Vaccines*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_2.pdf; *Module 3: Health Care Delivery*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_3.pdf; *Module 4: Care for the Deceased*, available at https://www.bop.gov/resources/pdfs/pan_flu_module_4.pdf.

BOP has also implemented screening protocols for both BOP staff and inmates, with staff being subject to "enhanced screening" and inmates being subject to screening managed by its infectious disease management programs. *Id.* As part of BOP's inmate screening process, (i) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (ii) "[a]symptomatic inmates with exposure risk factors are quarantined"; and (iii) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols." *Id.*

These and other measures were outlined in a March 18, 2020 letter from BOP to Chief Judge McMahon in response to questions regarding the MCC's (and Metropolitan Detention Center's) institutional responses to COVID-19. Subsequent Phases of the BOP's response plan have since been implemented. On April 1, 2020, the BOP announced implementation of Phase Five of its response protocols, which involved a mandatory 14-day quarantine lockdown of all inmates across the BOP system.[5] The Government understands that inmates at MCC who present symptoms consistent with COVID-19 are assessed by a health services staff unit and checked at least twice a day.

Based on the data, MCC's efforts to mitigate the spread of the virus have had positive results. As reflected in the September 8, 2020 joint MCC/MDC letter to Chief Judge Rosylynn R. Mauskopf, of the Eastern District of New York, (Def.'s Motion, Ex. C), as of September 8, the number of MCC inmates who had tested positive since March 13, 2020 is 36.

The MCC's swift action in taking appropriate mitigating measures, and the absence of any allegation by the defendant that inmates at MCC has died from COVID-19, undermine the defendant's claim that the MCC is not adequately managing COVID-19.

The Government does not minimize the risks of COVID-19 in general. But the defendant has not shown that his recent report of asthma a compelling reason to release him notwithstanding the danger to the community and risks of flight attendant to such release.

That conclusion is in line with recent bail decisions in this District, which have been careful to analyze the circumstances of each case in light of COVID-19. Many judges of this District have been rejecting applications for release based on assertions about the hypothetical risks of COVID-19, including in cases involving defendants with asthma or similar underlying health conditions. *See, e.g., United States v. Paulino*, No. 19 Cr. 54 (PGG) (S.D.N.Y. Apr. 13, 2020) (Gardephe, J.) (denying bail application by 29-year-old defendant with hypertension who committed an armed robbery, stating that "[a]s serious as it is, the outbreak of COVID-19 simply does not override the statutory detention provisions [of the Bail Reform Act]"); *United States v. Matias*, No. 20 Cr. 40 (LTS) (S.D.N.Y. Apr. 9, 2020) (Swain, J.) (denying bail application based on COVID-19 of MCC inmate charged with narcotics trafficking and Section 924(c) offenses, finding defendant had failed to rebut presumption that he posed a danger to the community and that COVID-19 did not support temporary release under Section 3142(i)); *United States v. Fernandez-Rodriguez*, No. 20 Cr. 43

---

[5] *See* https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp.

(GBD) (S.D.N.Y. Apr. 8, 2020) (Daniels, J.) (denying pretrial bail for MCC inmate with asthma); *United States v. Dixon*, No. 20 Cr. 88 (DLC), ECF No. 17 (S.D.N.Y. Apr. 7, 2020) (Cote, J.) (denying bail application by inmate at MDC with asthma); *United States v. Days*, No. 19 Cr. 619 (CM) (S.D.N.Y. Apr. 7, 2020) (McMahon, C.J.) (denying bail application of inmate with asthma charged with narcotics trafficking); *United States v. Alamo*, No. 19 Cr. 640 (RMB) (S.D.N.Y. Apr. 7, 2020) (Berman, J.) (denying MCC inmate's bail application based on COVID-19); *United States v. Irizarry*, No. 19 Cr. 913 (SHS) (S.D.N.Y. Apr. 3, 2020) (Stein, J.) (denying pretrial bail for MCC inmate with asthma in light of dangerousness of alleged drug and firearms offenses and history of failure to appear in court); *United States v. Velez*, No. 19 Cr. 862 (VEC) (S.D.N.Y. Apr. 2, 2020) (Caproni, J.) (denying pretrial bail for gang member who suffered pancreatitis and respiratory issues); *United States v. Lewis*, No. 20 Cr. 234 (LAP) (S.D.N.Y. Apr. 1, 2020) (Castel, J., sitting in Part I) (denying bail for inmate with multiple sclerosis in light of serious risk of danger to the community posed by alleged drug trafficking conduct and prior drug trafficking conviction); *United States v. Conley*, No. 19 Cr. 131 (PAE) (S.D.N.Y. Mar. 31, 2020) (Engelmayer, J.) (denying pretrial bail for MCC inmate on high-risk list with asthma, partial lung removal, diabetes, high blood pressure, and hypertension because medical risks were outweighed by serious risk of danger to community); *United States v. Chambers*, No. 20 Cr. 135 (JMF) (S.D.N.Y. Mar. 31, 2020) (Furman, J.) (denying pretrial bail by inmate with asthma in light of serious risk of danger to the community); *United States v. Fofana*, No. 19 Cr. 447 (DLC) (S.D.N.Y. Mar. 30, 2020) (Cote, J.) (denying pretrial bail for defendant with asthma); *United States v. Vincent*, No. 20 Cr. 78 (AT) (S.D.N.Y. Mar. 30, 2020) (Torres, J.) (denying pretrial bail application for inmate based on COVID-19); *United States v. Marte*, No. 19 Cr. 795 (SHS) (S.D.N.Y. Mar. 27, 2020) (Stein, J.) (denying pretrial bail for defendant with history of smoking and Percocet addiction).

As Judge Castel and other judges of the District have recognized, COVID-19 does not require the release of all prisoners from BOP custody unless BOP can 100% guarantee their safety from the pandemic:

> The question is posed as whether the defendant will be safe in the custody of the U.S. Marshals and the Bureau of Prisons. I'm not sure that's the question. Even in taking into account the safety issue, the reality is that New York is plagued with an ever-growing number of COVID-19 cases. . . . And so you are not safe if you are out on bail. You are not safe if you are in the MCC. So the question is not are the U.S. Marshal Service and the Bureau of Prisons the guarantors of the safety of this defendant from COVID-19. That's not the standard. The reality is they are not the guarantors, nor is the mayor and Governor of the State of New York or President of the United States the guarantor of the safety of the people on the streets of Manhattan. The Bureau of Prisons and the MCC are taking serious precautions, including the quarantine announced today, to keep people as safe as possible in the environment.

*United States v. Lewis*, No. 20 Cr. 234 (LAP), Apr. 1, 2020 Tr. at 18-19 (S.D.N.Y. Apr. 1, 2020) (Castel, J., sitting in Part I) (denying bail on dangerousness grounds for defendant suffering from multiple sclerosis); s*ee also United States v. Marte*, No. 19 Cr. 795 (SHS) (S.D.N.Y. Mar. 30, 2020) (denying bail application for 42-year old defendant without a "special condition making him

substantially vulnerable to COVID-19" because "the pandemic alone, which is affecting the community in its entirety, is not a compelling reason warranting release at this time"); *United States v. Nunez*, No. 20 Cr. 239 (ER) (S.D.N.Y. Apr. 10, 2020) (Ramos, J.) (rejecting bail application based on COVID-19 and noting that "because there is a pandemic does not mean that the jailhouse doors ought to be thrown open"). What matters is whether a particular defendant has established a compelling reason for release, and this defendant has not.

### IV.   CONCLUSION

For the foregoing reasons, the defendant's motion for release should be denied

                Respectfully submitted,

                AUDREY STRAUSS
                Acting United States Attorney


          By: */s/ Jeffrey C. Coffman*
                Jeffrey C. Coffman
                Assistant United States Attorney
                (914) 993-1940


cc:  David Arthur Ruhnke, Esq.
     Diane Ferrone, Esq.
     by ECF